UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

ROBERT HALF INC.,                                          **ECF CASE**

        Plaintiff,                                Civil Action No. _____

     v.                                            <u>**VERIFIED COMPLAINT**</u>

JESSE COHEN,

        Defendant.
-------------------------------------------------------------------x

Plaintiff Robert Half Inc. ("Plaintiff" or "Robert Half"), by its undersigned counsel, Faegre Drinker Biddle & Reath LLP, by way of Complaint against Jesse Cohen ("Defendant" or "Mr. Cohen"), alleges as follows:

<u>**PRELIMINARY STATEMENT**</u>

Mr. Cohen is a former highly compensated employee of Robert Half who has violated his valid and enforceable Robert Half employment agreement (the "Employment Agreement") by commencing employment with Mission Staffing, Inc. ("Mission Staffing"), Robert Half's direct competitor, within his narrow-restricted territory and then using Robert Half's confidential and proprietary information and goodwill to target the very Robert Half clients and candidates that he worked with at Robert Half. In fact, Mr. Cohen began competing with Robert Half while he was still employed by Robert Half, violating his duty of loyalty in the process. Robert Half now seeks relief from, and compensation for damages caused by, such misconduct, as described in greater detail below.

## PARTIES

1.    Robert Half is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business located at 2884 Sand Hill Road, Menlo Park, California 94025.  Robert Half is authorized to do business in and maintains offices in New York.

2.    Upon information and belief, Mr. Cohen is an adult citizen of the State of New York, residing at 5 Kristoffer Court, New City, New York 10956.

## JURISDICTION AND VENUE

3.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) (diversity of citizenship) because there is complete diversity of citizenship between the parties and the matter in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

4.    This Court also has subject matter jurisdiction over Robert Half's claims under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1367 (supplemental jurisdiction) because the Complaint alleges a claim for misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, and Robert Half's other claims are so related to its federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

5.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because, upon information and belief, Mr. Cohen works in this District and the events and omissions giving rise to the claims asserted in the Complaint occurred in this District.

6.    This Court has personal jurisdiction over Mr. Cohen because, upon information and belief, Mr. Cohen is domiciled in New York, Mr. Cohen entered into the contract at issue while in New York, and Mr. Cohen breached the contract at issue while working in New York.

## FACTS

**A.     The Business of Robert Half and Mission Staffing**

7.     Robert Half specializes in the recruitment and placement of persons for temporary and permanent employment in certain specialized fields (e.g., accounting, administrative, creative).  Robert Half maintains branch offices throughout the United States, including in New York City, where it or its predecessors have been providing professional staffing services for over 30 years.

8.     Robert Half has several professional staffing divisions, including Robert Half Contract Finance & Accounting® ("CFA"), which was formerly known as Accountemps®.  Through its CFA division, Robert Half places finance and accounting professionals (*e.g.*, accountants, bookkeepers, etc.), known as "contract talent" or "candidates," on a temporary or project basis with companies in need of such services, known as "clients."

9.     Robert Half expends time and money to teach its employees the business development techniques and business methods Robert Half has developed in its specialized fields of expertise.

10.     As a result of its reputation, training and marketing efforts, Robert Half has become broadly recognized as a source from which clients and qualified candidates may seek placement services in New York City and throughout the United States.  Robert Half's relationships with its clients are based on confidence in the quality of the services offered and an increased recognition of, and familiarity with, Robert Half as a provider of such quality services.

11.     As such, some of Robert Half's most important assets include the goodwill and business reputation that Robert Half enjoys, its clients, its pool of qualified candidates for

employment, as well as the information compiled about such candidates, and its confidential information relating to its clients (including their preferences, needs and requirements).

12.     Robert Half's goodwill is critical to its success and includes repeat business with its established clients and candidates.  Its repeat business with clients results from its successful performance of placement services, its extensive advertising and well-deserved reputation for guarding the confidentiality of the information that it has gathered, analyzed, and developed over the period of its many years of existence, as well as its clients' relationships with Robert Half and its recruiting staff, including Mr. Cohen.

13.     Robert Half's staffing professionals are responsible for developing and effectively assessing a base of qualified candidates for placement with Robert Half's clients, for locating such placement opportunities with new and existing clients of Robert Half, and for developing, cultivating, and maintaining both new and existing client relationships with the goal of growing Robert Half's business opportunities to make such placements across all of its business lines.

14.     All of Robert Half's staffing professionals are given training on and access to Robert Half's confidential information contained in its confidential files and computer databases. Because Robert Half's business is a service business, the relationship that Robert Half has with its clients and candidates is dependent on the personal attention and service that Robert Half staff employees give, on an ongoing basis, to each of Robert Half's clients and candidates.

15.     As a result of the access provided to Robert Half employees, Robert Half requires, as a condition of employment, that its employees enter into an employment agreement containing restrictive covenants, including non-competition, non-solicitation, and non-disclosure provisions.

16.     Upon information and belief, agreements containing such provisions are common in the staffing industry.

17.    Mission Staffing competes directly with Robert Half in the placement of temporary and permanent employees in various fields throughout the country, including in the New York City metropolitan area.

18.    According to Mission Staffing's website, Mission Staffing "is comprised of four Service Divisions: Direct Hire, Temporary and Consultant Services, Payroll Services and On-Site Solutions" and "is an industry leader in the financial services sector, regularly placing analyst-level to C-Suite professionals with banks, broker dealers, hedge funds, private equity, real estate, family offices, public accounting, management consulting, media and technology companies."

**B.    Mr. Cohen's Receipt and Development of Robert Half's Goodwill and Customer Relationships, and His Access to Robert Half Trade Secrets, Including its Confidential Client and Candidate Databases.**

19.    Robert Half is successful because it works hard to develop deep relationships with its actual and prospective clients and candidates.  In an industry where the client or candidate has several choices, Robert Half's best chance for success exists where it has a relationship with the client and/or candidate at issue, and they trust Robert Half to meet their needs.  These relationships develop through the efforts of Robert Half's employees, and Robert Half pays them in large part to develop those relationships.

20.    Robert Half is also successful because it is able to identify those potential clients who find value in using staffing agencies to fill temporary positions and are willing to pay the associated fees, while excluding those companies that, for one reason or another, are unlikely to retain a staffing company's services.  Robert Half also works hard and has developed tools to refine its information further so that, even within the subset of companies who are interested in working with staffing companies, it identifies those who are more active and either have current needs or are likely to have them soon.

21.     In order to perform his duties, Mr. Cohen received training by Robert Half and was given access to, and did in fact access, Robert Half's confidential and proprietary information.  He also became intimately involved with many of Robert Half's customer accounts, key candidates, and projects.

22.     Specifically, Mr. Cohen had access to, and contributed to, the substantial client database that Robert Half has developed and that contains critical information for thousands of prospective and actual clients, including in the New York City metropolitan area and Long Island (the "Client Database").  The Client Database, which has been developed over many years and at great time and expense, contains confidential and proprietary business information, such as:

a.     The names, addresses, and telephone numbers of each Robert Half client and prospective client;

b.     The name, title, cell phone and email address of the contact person for each Robert Half client and prospective client;

c.     The name, title, address, email address, cell phone and telephone number of each decision maker in every department of each Robert Half client and many prospective clients;

d.     The particular requirements and preferences of each client and many prospective clients;

e.     The pay rates or fees negotiated with each client;

f.     The price range each client is willing to pay;

g.     The number and type of candidates placed with each client;

h.     The skill sets required by each client and many prospective clients;

i.     Information regarding candidates pending with or submitted to each client for placement;

j.     Credit information for each client and many prospective clients; and

k.     Other information pertinent to serving each client and prospective client.

23.     The detailed information concerning client contacts and their respective preferences, etc., contained in the Client Database is integral to Robert Half's efforts at developing and maintaining its goodwill.  Robert Half protects the confidentiality of such information and,

therefore, such lists and information constitute trade secrets and/or proprietary, confidential information.

24.     In addition to the Client Database, Mr. Cohen had access to, and contributed to, Robert Half's candidate database (the "Candidate Database"), which Robert Half also developed, and which contains information about thousands of candidates eligible to be placed by Robert Half with Robert Half clients.  The Candidate Database contains such information as each candidate's:

   a.     Name, address and telephone number;

   b.     Skills and experience;

   c.     Reference information (including address and telephone number of references and information provided);

   d.     Education and employment history;

   e.     Previous assignments and experiences on those assignments;

   f.     Pay rates for which each candidate is willing to work and geography in which they are willing to work;

   g.     Pay history;

   h.     Performance evaluations;

   i.     Interview ratings;

   j.     The types of roles sought; and

   k.     Notes regarding any issues relevant to the candidate.

25.     These files, and the information they contain, such as test results and client performance appraisals of how a candidate performed on temporary/consulting assignments, allow Robert Half to develop first-hand experience with the skill level of each candidate and to quickly determine which candidates will be a fit for a particular client's needs.

26.     All Robert Half employees involved in recruiting and placement functions, including Mr. Cohen, have access to and utilize both the Client Database and the Candidate Database, as well as sophisticated technology tools that enable staffing professionals to quickly search within the database to identify contract talent who have the in-demand skills a client is

seeking and who are likely to be successful in a role based on their work history and skill set.  As a result, Robert Half staffing professionals like Mr. Cohen spend little to no time "cold calling" companies.  Instead, they focus on "warm" and "hot" leads, which Robert Half gathers in several, targeted ways and which Robert Half tracks in the Client and Candidate Databases.

27.     Over the years, Robert Half has developed business relationships and goodwill with numerous clients and candidates, and Robert Half's staffing professionals like Mr. Cohen have access to those relationships in the New York City metropolitan area, Long Island, and elsewhere.

28.     Indeed, Robert Half employed Mr. Cohen and compensated him specifically so that he would focus his efforts on developing these relationships, thereby contributing to the goodwill of the company.

29.     Robert Half's Client and Candidate Databases are extremely valuable assets and have been compiled only after spending significant time, effort, and resources.  The information compiled in these databases is generally not known or readily ascertainable and, as such, could easily be exploited by Robert Half's competitors to allow them to gain a competitive advantage over Robert Half.

30.     To protect the information contained in these databases as well as Robert Half's client relationships, Robert Half has adopted company-wide written policies restricting the disclosure or use of this information other than for official company purposes.  Additionally, Robert Half requires each of its staffing professionals to execute employment agreements and other documents with strict confidentiality provisions as a condition of employment.  Further, Robert Half's confidential database information is password protected, and Robert Half restricts and limits who can access and use such information; requires each user to execute a confidentiality pledge each time he or she accesses the system; and strictly controls remote access to the database by

employees.   These measures are reasonable measures designed to protect Robert Half's confidential information and trade secrets.

31.     Mr. Cohen had access to and utilized Robert Half's confidential and trade secret information as related to Robert Half's CFA division, including throughout the New York City metropolitan area and Long Island.

32.     The staffing business has virtually no barriers to entry.   Thus, the type of trade secrets and confidential information that Mr. Cohen had is critical to Robert Half's business.   The trade secrets and confidential information are used by Robert Half's staffing professionals in making multi-state placements (i.e., serving clients or candidates in various states).

33.     Also critical are customer and candidate goodwill, which Robert Half pays its staffing professionals to develop on behalf of Robert Half, so that when positions or candidates are available, clients and candidates look to Robert Half for assistance.

34.     Robert Half spends hours and hours developing these relationships, largely through the activities of its staffing professionals.   Mr. Cohen has demonstrated the value of such relationships already by, as discussed below, targeting the very clients and candidates that he worked with at Robert Half even *before* he resigned, for the purpose of improperly diverting those relationships to Mission Staffing.

35.     Mr. Cohen knew that Robert Half specifically identified the information set forth above as confidential proprietary information, and that such information has not been published or otherwise become a matter of public knowledge.   Further, Mr. Cohen knew that he was only permitted to use such information for the exclusive benefit of Robert Half, and that it was to be otherwise kept strictly confidential.

36.     Mr. Cohen knew that disclosing Robert Half's trade secret, confidential and proprietary information would operate to the detriment of Robert Half and to the commercial advantage of its competitors, including his new employer, Mission Staffing.

**C.    Mr. Cohen's Employment with Robert Half**

37.     Mr. Cohen began working for Robert Half on or around July 11, 2016, as an Accountemps Staffing Manager in Robert Half's office located at One Liberty Plaza, New York, NY 10006 (the "Wall Street Office").  Upon information and belief, prior to working at Robert Half, Mr. Cohen had no staffing industry experience.

38.     As an Accountemps Staffing Manager, Mr. Cohen cultivated relationships with various companies and then serviced them by recruiting candidates to fill their temporary finance and accounting positions.

39.     In his position, Mr. Cohen received a base salary and monthly and annual performance bonuses through Robert Half's Total Rewards Compensation Plan based on his placement activity.

40.     Mr. Cohen was a highly skilled recruiter, and Robert Half compensated him well for his efforts, including the client and candidate goodwill that he generated.  For example, in 2023, Mr. Cohen earned well over $400,000, and in 2024 he earned over $350,000.

41.     Mr. Cohen received not only increased compensation, but also promotions at Robert Half.  At the time of his resignation, Mr. Cohen was a Senior Vice President and CFA Practice Director, with responsibility for managing the entire CFA function in the Wall Street Office.

42.     While employed by Robert Half, Mr. Cohen serviced clients and worked with candidates both inside Robert Half's downtown Manhattan market (the "Downtown Market") and

outside of it, including in the greater New York City metropolitan area and Long Island.  The

Downtown Market consists of those areas of Manhattan that are south of [15th Street].

43.     Mr. Cohen had access to the information contained within Robert Half's Client and

Candidate Databases, and regularly accessed job order information, candidates, leads and clients.

44.     Mr. Cohen also frequently consulted with colleagues in Robert Half's other New

York offices on a less formal basis.  In the years following the COVID-19 pandemic, Mr. Cohen

and other Robert Half employees from the Wall Street Office frequently worked out of Robert

Half's Midtown Manhattan office, located at 125 Park Avenue, New York, NY 10017.

45.     As a consequence, Mr. Cohen was intimately familiar with Robert Half's business

strategy, particularly in the Wall Street Office in which he worked, including but not limited to

Robert Half's customer and client preferences and relationships; contracts and pricing; business

initiatives; competitive advantages and disadvantages; and approaches to new markets and

customers.

1.      *Mr. Cohen's Robert Half Employment Agreement*

46.     In order to protect Robert Half's trade secrets and confidential information, its

reputation and good name, and its market position, Mr. Cohen was required by Robert Half as a

condition of his employment to enter into the Employment Agreement at the outset of his

employment.  The Employment Agreement contained certain restrictive covenants, including non-

competition, non-solicitation, and non-disclosure provisions.

47.     Mr. Cohen executed the Employment Agreement, a true and accurate copy of which

is attached hereto as **Exhibit A**, on or about July 11, 2016.

48.    The restrictive covenants in Mr. Cohen's Employment Agreement prohibit him from disclosing or misusing Robert Half's confidential information.  Section 8 of the Employment Agreement provides:

> Disclosure or Misuse of Confidential Information.  Employee shall not, at any time during Employee's employment by any of the RHI Companies [Robert Half and its affiliates] or thereafter, directly or indirectly, disclose, furnish or make accessible to any person, firm, corporation, or other entity, or make use of, any confidential information of any of the RHI Companies or any third parties to whom RHI Companies owe a duty of confidentiality, including, without limitation, information with respect to the name, address, contact persons or requirements of any existing or prospective customer, client, applicant, candidate or employee of any of the RHI Companies (whether having to do with temporary, contract, regular, or full-time employment) and information with respect to the procedures, advertising, finances, organization, personnel, plans, objectives or strategies of the RHI Companies. Employee acknowledges that such information was developed by the RHI Companies at great time and expense and is safeguarded by the RHI Companies as trade secrets.  Upon termination of Employee's employment, Employee shall immediately deliver to Employer all records, manuals, training kits, and other property belonging to Employer or any of the other RHI Companies or used in connection with the business of Employer or any of the other RHI Companies, and all copies thereof, which may be in Employee's possession, custody or control.  The provisions of this Section shall survive termination of either Employee's employment or this Agreement for any reason.

49.    Moreover, also to protect Robert Half's trade secrets and confidential and proprietary information, as well as its goodwill, the Employment Agreement restricts Mr. Cohen for a period of 12 months from becoming employed by any competing staffing business within a 50-mile radius of any Robert Half office in which he worked or over which he exercised supervisory authority during the one-year period prior to the termination of his employment (defined within the Employment Agreement as "Applicable Office").  As applied to Mr. Cohen, "Applicable Office" means the Wall Street Office.  Section 9 of the Employment Agreement provides:

> Restrictive Covenant.  In consideration and view of (i) Employee's position with the RHI Companies, (ii) the valuable consideration furnished to the Employee by Employer employing Employee and entering into this Agreement, (iii) Employee's access to confidential information and trade secrets of the RHI Companies, and (iv)

the value of such confidential information and trade secrets to the RHI Companies, for a period of twelve (12) months after the Termination Date (regardless of the reason for termination or whether such termination was by Employer or by the Employee), Employee agrees that Employee shall not, directly or indirectly, own, manage, operate, control, be employed by, participate in, or be connected in any manner with the ownership, management, operation or control of, any Competitor in any part of the area encompassed within a radius of fifty (50) miles from any Applicable Office. The provisions of this Section shall survive termination of either Employee's employment or this Agreement for any reason. Notwithstanding the foregoing, this Section shall not apply in California or any other state in which such provisions are not enforceable under applicable State law.

50.     The geographic scope of the non-competition provision in the Employment Agreement is narrowly tailored to only restrict Mr. Cohen's activities in the geographic areas where he operated and/or had significant contact with Robert Half's clients and candidates during his Robert Half employment.

51.     The reasonableness of the geographic and temporal scope of the non-competition and non-solicitation provisions in the Employment Agreement has been accepted and the restrictions enforced by state and federal courts in other cases.

52.     In order to prevent unfair competition, to protect its goodwill, and to preserve the value of confidential information and trade secrets to which Robert Half employees are given access, the Employment Agreement also prohibits Mr. Cohen from soliciting certain of Robert Half's customers for a period of 12 months. Section 10 of the Employment Agreement sets forth:

Non-Solicitation of Customers. In consideration and view of (i) employee's position with the RHI Companies, (ii) the valuable consideration furnished to the Employee by Employer employing Employee and entering into this Agreement, (iii) Employee's access to confidential information and trade secrets of the RHI Companies, and (iv) the value of such confidential information and trade secrets to the RHI Companies, for a period of twelve (12) months after the Termination Date (regardless of the reason for termination or whether such termination was by Employer or by the Employee), Employee agrees that Employee shall not, directly or indirectly, on behalf of any Competitor, Solicit the trade or patronage of any Customer or perform services for any Customer. The provisions of this Section shall survive termination of either Employee's employment or this Agreement for any reason.

53.    "Customer," in turn, is defined as:

any person, firm, entity, business or organization for whom any of the Applicable Offices performs or has performed services in the course of its business within the twelve months preceding the Termination Date.

54.    In order to protect its right to the confidential and proprietary information that it pays its employees to develop, Mr. Cohen expressly acknowledged in Section 15 of his Employment Agreement that all client or candidate information collected or developed in any manner and through any media during his employment with Robert Half and that relates to Robert Half's business is "the sole and complete property of [Robert Half]."

55.    By executing the Employment Agreement, Mr. Cohen expressly acknowledged that the aforementioned restrictions (as set forth in Sections 9 and 10), "are reasonable and necessary in order to protect and maintain the proprietary and other legitimate business interests of [Robert Half], and that the enforcement thereof would not prevent Employee from earning a livelihood." *See* Section 14 of the Employment Agreement.

56.    Moreover, Mr. Cohen further agreed that temporary or permanent injunctive relief would be appropriate remedies against an actual or threatened breach of the above restrictions. *Id.*

### 2.    *Acknowledgement of Trade Secrets Law / Information Security Training*

57.    In a separate document entitled, "Acknowledgement of Trade Secret Laws," Mr. Cohen certified that he had read and understood the document upon commencing employment with Robert Half, and once again acknowledged, that he was going to be privy to Robert Half's confidential information and trade secrets, namely, client and candidate lists and related information.  Mr. Cohen agreed to safeguard such trade secrets and not to disclose, copy or remove them upon termination.  A true and correct copy of the Acknowledgment of Trade Secret Laws is attached as **Exhibit B**.

58.    The Acknowledgement of Trade Secret Laws provides, in part:

As a result of my employment, certain business records and information pertaining to the Company, the Company's affiliated companies, their employees, and clients may be made available to me, which I acknowledge constitute proprietary, confidential information and trade secrets ("Trade Secret" or "Trade Secrets").

. . .

I acknowledge and agree that I have a duty to safeguard such Trade Secrets, not to disclose them to others and not to remove or copy materials which include any Trade Secrets, or to use any Trade Secrets outside of my present employment.

. . .

I understand that after termination of my employment, my solicitation of any temporary or permanent employment applicant, recruited candidate, temporary employee, or client of the Company may constitute the illegal taking of a Trade Secret for which I could be enjoined and be liable for money damages.

A true and correct copy of Mr. Cohen's certification that he read and understood the Acknowledgment of Trade Secret Laws is attached as **Exhibit C**.

59.     Additionally, Mr. Cohen participated in Robert Half's annual Information Security Training, during which he was specifically advised, among other things, that Robert Half client and candidate information belongs to Robert Half and is confidential, and that Mr. Cohen has an obligation to protect such information.

60.     Throughout his employment with Robert Half, Mr. Cohen was entrusted with highly sensitive and confidential information concerning Robert Half's business and customer relationships, as described above.

61.     Moreover, Mr. Cohen developed relationships with candidates and clients on Robert Half's behalf.

62.     All such relationships were developed while Mr. Cohen was employed and paid by Robert Half.  Mr. Cohen's adherence to his contractual restrictive covenant obligations is thus of the utmost importance.

D.    **Mr. Cohen's Breach of the Employment Agreement, Misappropriation of Trade Secret Information, Breach of Duty of Loyalty, and Other Improper Conduct**

63.    Mr. Cohen resigned his Robert Half employment on January 7, 2025, effective immediately.

64.    Thereafter, Robert Half discovered that, prior to leaving Robert Half, Mr. Cohen had devised a scheme to compete with Robert Half immediately upon his separation and use Robert Half's trade secret information and goodwill to take its clients and candidates with him to Mission Staffing.  Robert Half also learned that Mr. Cohen began executing on this plan well before his resignation—while he was still employed by, and owed a duty of loyalty to, Robert Half.

65.    The first part of Mr. Cohen's disloyal scheme was to blast out mass emails soliciting more than 100 Robert Half clients and candidates just days before resigning from Robert Half.

66.    Mr. Cohen carefully selected the clients and candidates included in these emails. Rather than randomly selecting targets, he chose those that would give him and Mission Staffing the best chance to effectively lift out Robert Half's Wall Street Office's most active business and move it—lock, stock and barrel—to Mission Staffing.  Mr. Cohen could have competed fairly by using Mission Staffing's customer lists or by putting in the time, expense and energy to develop his own list at Mission Staffing.  Instead, he specifically targeted Robert Half's clients and candidates in violation of his Employment Agreement and fiduciary duties to Robert Half.

67.    Mr. Cohen sent these email blasts under the guise of updating his files on behalf of Robert Half as he moved into 2025.  In actuality, Mr. Cohen was actively violating his duty of loyalty to Robert Half by trying to recruit those clients and candidates for his new employer, Mission Staffing, while still employed by Robert Half.

68.    Specifically, on Thursday, January 2, 2025, Mr. Cohen emailed 49 Robert Half candidates whom Mr. Cohen had placed in positions with Robert Half's clients during his

employment with Robert Half.  In this email, Mr. Cohen stated, "should you find yourself job-seeking, I'd be more than willing to extend a helping hand."  Mr. Cohen also stated, "it would be appreciated if you could add me on LinkedIn as I aim to expand my network as we approach 2025", asked them "would you be able to pass my contract information on to your managers or hiring managers within your organization?" and provided his "direct cell phone number" rather than his Robert Half assigned work number—and a link to his LinkedIn page.  A true and accurate copy of this email is attached as **Exhibit D**.

69.    On Friday, January 3, 2025, Mr. Cohen sent an identical email blast to 48 more Robert Half candidates whom Mr. Cohen had also placed in positions with Robert Half's clients during his employment with Robert Half.  A true and accurate copy of this email is attached as **Exhibit E**.

70.    Mr. Cohen then, later that day, sent out a similar email blast to 11 Robert Half clients.  In this email blast, Mr. Cohen asked Robert Half's clients if they would "pass my contact information to other hiring managers within your organization" because "[t]his would help me tremendously in establishing new relationships in 2025."  Mr. Cohen again provided his "direct cell phone number"—but not his Robert Half work number—and a link to his LinkedIn profile.  A true and accurate copy of this email is attached as **Exhibit F**.

71.    While Mr. Cohen would sometimes send out email blasts to clients and candidates prior to these January 2025 emails, those previous emails were very different in nature and expose his true intentions in his January 2025 blasts.

72.    For example, in his pre-January 2025 email blasts, Mr. Cohen did not provide his personal cell phone number.  He would either not provide his phone number at all or provide his Robert Half assigned work phone number.

73.     By providing his personal cell phone number to more than 100 Robert Half candidates and clients just days before resigning from his employment with Robert Half, Mr. Cohen clearly sought to recruit these candidates and clients to work with him in his new role with Mission Staffing.

74.     In addition, during an instant messaging conversation with another Robert Half employee on January 3, 2025, Mr. Cohen stated that he had "[b]een soul searching lol" and would fill her in the following Tuesday, January 7, 2025, because "[i]ts an in person convo [*sic*]."  This conversation demonstrates that, by January 3, 2025, Mr. Cohen had already decided to leave Robert Half and further demonstrate his true intentions in sending out email blasts that day and the next.

75.     Mr. Cohen was not done.  On Sunday, January 5, 2025 (two days before his resignation), Mr. Cohen ran a series of 11 searches in the Client and Candidate Databases using the SalesForce Spotlight function, which allows Robert Half employees to apply a variety of search criteria to narrowly tailor their search results.   Searches conducted with this function yield information regarding, *inter alia*, (1) the job order number; (2) the job function; (3) the Robert Half client name; (4) the start and end date of the job; (5) the pay rate for the job; (6) the job status; and (7) the name of the placed candidate.  In other words, Mr. Cohen searched for exactly the information that one would want for a scheme, using Robert Half's goodwill and confidential information, to target clients and candidates most likely to move to, and do business with, Mission Staffing.

76.     First, Mr. Cohen searched for open CFA roles in Robert Half's Queens (New York) and Brooklyn (New York) branches.  These are open positions that Robert Half is working to fill

for its clients.  Mr. Cohen had no job-related reason to run this search.  The only reason to do the search was so that he could steal the information for use at Mission Staffing.

77.    Mr. Cohen ran the search for open CFA roles with the Queens and Brooklyn branches one time and then exported the results of this search to a Microsoft Excel document.  Upon information and belief, Mr. Cohen then transferred this Excel document into his personal possession.

78.    After this, Mr. Cohen searched for one of his direct report's active job placements.  This direct report serviced Robert Half clients and/or candidates in many of the same markets as Mr. Cohen, including in the New York City metropolitan area, Long Island, and beyond.  Robert Half employees may sometimes, in the ordinary course of business, search for their own active job placements to check in with a client or candidate.  However, there was no legitimate, job-related reason for Mr. Cohen to run a search for a direct report's active job placements.  Again, it is clear that Mr. Cohen's purpose in running this search was to steal some of Robert Half's most sensitive information for use at Mission Staffing.

79.    Mr. Cohen ran the search for one of his direct report's active job placements three times and then exported the results of these searches to another Excel document.  Upon information and belief, Mr. Cohen transferred this Excel document into his personal possession.

80.    Mr. Cohen then searched for his completed placements.  Through the criteria he applied to this search, the search yielded information regarding every completed placement with which he was involved with during his eight-plus years of employment – more than 3,600 placements.  This too was some of Robert Half's most valuable information.  With it, Mr. Cohen was able to deliver to Mission Staffing (and use for himself) a confidential list of quite literally, those clients and candidates, out of the thousands of businesses in the Downtown Market and

elsewhere, and the millions of people in New York City and beyond, who would most likely generate business for him and Mission Staffing.  It would also allow him and Mission Staffing to use Robert Half's goodwill with these clients and candidates to try and divert them to Mission Staffing.

81.    Mr. Cohen ran the search for his completed jobs four times on January 5, 2025, and then exported the results of these searches to an Excel document.  Upon information and belief, Mr. Cohen transferred this Excel document into his personal possession.

82.    Mr. Cohen took the following Monday, January 6, 2025, off from work.  Despite not working that day, Mr. Cohen ran four more searches for his completed jobs in the Client and Candidate Databases.  Once again, he exported the results of these searches to an Excel document.  Upon information and belief, Mr. Cohen then transferred this Excel document into his personal possession.

83.    To summarize the aforementioned conduct, Mr. Cohen ran searches on January 5 and January 6 in the Client and Candidate Databases for (1) open CFA roles for two Robert Half branches for which he had no responsibilities; (2) the active job placements of a colleague who serviced the same markets Mr. Cohen is now servicing on behalf of Mission Staffing; (3) his own active job placements; and (4) every single one of his completed jobs throughout the entirety of his Robert Half employment – more than 3,600 jobs.  Mr. Cohen exported the results of these searches to Excel files and, upon information and belief, transferred these Excel files into his personal possession.

84.    January 5 was a Sunday, January 6 was a vacation day for Mr. Cohen, and January 7 was resignation day for him.  Clearly, Mr. Cohen was not acting as a dutiful employee hard at

work through a weekend and vacation day, but as a soon to be former employee days away from joining a direct competitor and attempting to set himself up for immediate success.

85.    On January 6, 2025, Mr. Cohen also emailed Richard Deosingh, Robert Half's District President, and Jennie Ramirez, Vice President and Branch Director for Robert Half Contract Talent, to "put some time on the calendar to meet first thing tomorrow morning."

86.    The following morning, January 7, 2025, Mr. Cohen resigned from his employment with Robert Half, effective immediately.  During his exit interview, Mr. Cohen stated that he intended to abide by his post-separation obligations to Robert Half, including those in his Employment Agreement.  However, as described herein, he was already egregiously violating them.

87.    Following his resignation, Robert Half provided Mr. Cohen with a "Reminder of Post-Termination Obligations," which again explicitly and clearly set forth his post-termination restrictions regarding confidential information and trade secrets, as well as non-competition covenants.  A true and correct copy of the Reminder of Post-Termination Obligations provided to Mr. Cohen is attached as **Exhibit G**.

88.    Immediately after resigning from Robert Half, Mr. Cohen began to work for Mission Staffing, out of its Midtown Manhattan office, located at 370 Lexington Avenue, Suite 1601, New York, NY 10017, which is approximately 3.5 miles from Robert Half's Wall Street Office.[1]

---

[1] On January 10, 2025, Mr. Cohen received an email to his Robert Half email account stating, "[t]he email address jcohen3@missionstaffing.com was recently added to your LinkedIn account." A true and accurate copy of this email is attached as **Exhibit H**.

89.     Mission Staffing directly competes with Robert Half insofar as it provides temporary and permanent accounting and finance professionals to firms who require such services in New York, including in the Downtown Market, and elsewhere.

90.     Mission Staffing's company website lists Mr. Cohen as an Executive Director in its Temporary & Consulting Division.  Its website lists Accounting & Finance as one of its Temporary & Consulting Division's "areas of expertise."

91.     Thus, Mr. Cohen is providing the same staffing services in the same industry within the same area that he provided staffing services during his employment with Robert Half.

92.     By commencing employment with a direct competitor within the restricted area within days of resigning from Robert Half, Mr. Cohen directly violated the terms of his Employment Agreement.

93.     So far, Mr. Cohen's theft of Robert Half trade secret customer information and disloyal outreach efforts has worked as he had planned, as he received several responses to his solicitation emails from Robert Half's clients and candidates.  True and accurate copies of these emails are attached as **Exhibit I**.[2]

94.     Since joining Mission Staffing, Mr. Cohen has been following up on the email blasts that he sent while still at Robert Half in continued attempt to move clients and candidates from Robert Half to Mission Staffing—exactly what his Employment Agreement prohibits.  Upon information and belief, he is using the client and candidate information he took from Robert Half to do so.

95.     For example, on January 14, 2025, Mr. Cohen further solicited a Robert Half client ("Client 1") on January 14, 2025, and stated, "[t]hank you for taking my call today.  Hopefully,

---

[2] The responses are redacted to remove client names and other identifying information.

we can partner up on something soon!  Attached is our draft fee agreement, both temp & perm.

Please let me know if you have any changes you'd like to make before I add your company

information."  A true and accurate copy of this email is attached as **Exhibit J**.

96.     Client 1 is a client that Mr. Cohen met through his Robert Half employment and

with which he worked frequently in the course and scope of that employment.  In the months

leading up to his resignation, Mr. Cohen was in consistent communication with Client 1 regarding

its open positions and candidates he believed were a fit for them.  For example, on October 29,

2024, Mr. Cohen visited Client 1 on-site to discuss one of his candidates who was reviewing an

offer from Client 1.  As another example, Mr. Cohen communicated with Client 1 on December

30, 2024, regarding one of the candidates he placed with Client 1 who Client 1 was converting to

permanent employment.

97.     Mr. Cohen's January 14, 2025 email to Client 1 was sent from his Mission Staffing

email address.  His email signature in this email identified him as the "Executive Director – Head

of Professional Services" for Mission Staffing.  Therefore, it would have been clear to Client 1

that Mr. Cohen was soliciting business on behalf of his new employer – Mission Staffing – and

not on behalf of Robert Half.

98.     Since learning that Mr. Cohen was soliciting Client 1, five other Robert Half clients

have informed Robert Half that Mr. Cohen has solicited them on behalf of Mission Staffing.  Mr.

Cohen actively worked with three of these clients during his employment with Robert Half, and

he knew the other two through his exposure to other Robert Half teams and placements of his

candidates with Robert Half clients.

99.     On or about January 23, 2025, Robert Half sent a letter to Mr. Cohen via overnight

delivery, reminding him of his Employment Agreement and of the restrictive covenants contained

therein, and of his continuing obligations under the foregoing, and demanding that he cease violating those covenants. Robert Half also sent a copy of the letter to Mission Staffing. A true and accurate copy of the letter, without enclosures, is attached as **Exhibit K**.

100. Neither Mr. Cohen nor Mission Staffing responded to the letter.

101. On or about February 11, 2025, Robert Half, through counsel, in a last attempt to avoid litigation, sent another letter to Mr. Cohen via overnight delivery. This letter again demanded that Mr. Cohen cease violating his Robert Half Employment Agreement and warned that if he did not contact Robert Half's counsel by February 19, 2025, Robert Half would promptly commence litigation against him. Robert Half also sent a copy of the second letter to Mission Staffing. A true and accurate copy of this second letter, without enclosures, is attached as **Exhibit L**.

102. On or about February 11, 2025, Robert Half, through counsel, also sent a separate letter to Mission Staffing, which demanded that Mission Staffing confirm that it would ensure Mr. Cohen's compliance with his Employment Agreement. A true and accurate copy of the cease-and-desist letter sent to Mission Staffing is attached as **Exhibit M**.

103. Mission Staffing did not respond to the letters. Mr. Cohen, through counsel, responded on February 19, 2025.

**E.    Irreparable Harm to Robert Half**

104. Mr. Cohen's actions have harmed and continue to harm Robert Half's business, specifically its relationships with its clients and candidates, reputation, and goodwill.

105. Among other things, Robert Half has spent numerous hours identifying businesses within the New York City metropolitan area and Long Island—out of the thousands of businesses in those areas—and beyond that are interested in receiving staffing services. Mr. Cohen has now

taken the fruit of that labor, and the related confidential information, to Mission Staffing and is actively using it for his own and Mission Staffing's benefit.

106.    Mr. Cohen and Mission Staffing are now also trading on the very same goodwill and relationships that Robert Half paid Mr. Cohen to develop, usurping Robert Half's goodwill and relationships for their own use.

107.    Mr. Cohen's and Mission Staffing's ongoing use of Robert Half confidential information, trade secrets and goodwill creates harm that money cannot rectify.  In fact, Mr. Cohen recognized this irreparable harm in his Employment Agreement, which states, "Employee further agrees that in the event of an actual or threatened breach by Employee of such covenants, Employer and the other RHI Companies would be irreparably harmed and the full extent of injury therefrom would be impossible to calculate and Employer and the other RHI Companies therefore would not have an adequate remedy at law."  Exh. A, Employment Agreement at §14.

108.    The unique relationships with Robert Half's clients and candidates, which Mr. Cohen was given an opportunity to forge by and on behalf of Robert Half, have been disrupted and irreparably harmed.

109.    Injunctive relief is necessary and appropriate because, if Mr. Cohen continues to compete unfairly, Robert Half will suffer further damages and cannot be compensated by money alone.

110.    Robert Half is also entitled to monetary damages for the harm Mr. Cohen, working with Mission Staffing, has caused Robert Half.

## COUNT I – BREACH OF CONTRACT

111.    Robert Half incorporates herein by reference the allegations of the preceding paragraphs.

112.    The Employment Agreement is a valid and enforceable contract.

113.    Mr. Cohen voluntarily entered into the Employment Agreement in consideration for his employment with Robert Half and incident to that employment relationship.

114.    The post-employment restrictive covenants contained within the Employment Agreement are reasonable in temporal and geographic scope and are necessary to protect Robert Half's protectable interests in its trade secrets and confidential information, as well as its client relationships, goodwill and other legitimate business interests.

115.    Robert Half fully performed its obligations under the Employment Agreement, including by compensating Mr. Cohen handsomely for the very confidential information, goodwill and relationships that he has taken and is now using for his own benefit and that of Mission Staffing.

116.    Mr. Cohen has breached and continues to breach the express terms of the Employment Agreement that he signed as a condition of his employment with Robert Half by commencing employment with Mission Staffing, Robert Half's direct competitor, within his narrow-restricted territory and then using Robert Half's confidential and proprietary information and goodwill to target the very Robert Half clients and candidates that he worked with at Robert Half.

117.    Mr. Cohen will continue such wrongful conduct unless enjoined.

118.    By such actions, Mr. Cohen has caused and continues to cause Robert Half immediate and irreparable harm, loss of goodwill, harm to its business, and other injury and damages for which Robert Half has no adequate remedy at law.

119.    As a direct and proximate result of Mr. Cohen's breaches of his Employment Agreement, Robert Half already has suffered and will continue to suffer additional damages in an

amount that is not presently ascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, lost profits, and damages to its goodwill, in an amount to be proven at trial.

## COUNT II – TRADE SECRET MISAPPROPRIATION IN VIOLATION OF THE FEDERAL DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836 *ET SEQ.*

120.    Robert Half incorporates herein by reference the allegations of the preceding paragraphs.

121.    Mr. Cohen violated the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, *et seq.* (the "DTSA"), by misappropriating trade secrets from Robert Half for services used in, or intended for use in, interstate or foreign commerce.

122.    The DTSA defines "trade secret" to include all forms of financial, and economic information, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if— (a) the owner thereof has taken reasonable measures to keep such information secret; and (b) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.  *See* 18 U.S.C. §§ 1836, 1839.

123.    As detailed above, Mr. Cohen had access to Robert Half's trade secrets throughout his employment, including the information contained in the Client and Candidate Databases.

124.    Robert Half's confidential and trade secret information, including the information contained in the Client and Candidate Databases, is used in interstate commerce through Robert Half's nationwide business activity, including its recruitment and placement of persons for temporary and permanent employment throughout the United States.

125.    Mr. Cohen is using and will continue to use Robert Half's trade secrets to conduct business if not enjoined.

126.    Robert Half invested substantial time and resources to generate such information that Mr. Cohen misappropriated.  The information contained in the misappropriated materials derives independent economic value by virtue of not being known or available to the public. Robert Half has kept this information sufficiently secret to give it a competitive advantage.  It has taken affirmative measures to prevent others from acquiring it or using it by means including, but not limited to, requiring those who have access to it (including Mr. Cohen) to sign agreements restricting their use of Robert Half's confidential information.  Access to Robert Half's systems, including employee computers, phones, and other devices, is password protected.

127.    Robert Half communicated its trade secrets to Mr. Cohen in confidence and he knew that Robert Half's trade secrets (a) are confidential; (b) were acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use; (c) were developed or acquired by Robert Half at great expense and effort; (d) are maintained as confidential and are not generally available to the public or Robert Half's competitors; (e) would provide significant benefit to a competitor seeking to compete with Robert Half; and (f) are critical to Robert Half's ability to conduct its business successfully.  As such, Mr. Cohen promised to keep Robert Half's trade secrets confidential, to use Robert Half's trade secrets only on behalf of Robert Half, and to return and discontinue use of Robert Half's trade secrets when his employment with Robert Half ended.

128.    Due to his position working for a direct competitor of Robert Half, his possession of Robert Half's trade secrets and confidential and proprietary information, and his improper activities to date, there is a substantial likelihood that Mr. Cohen has disclosed or used, and will continue to use, Robert Half's trade secrets.

129.    Moreover, as described herein, Mr. Cohen misappropriated Robert Half's trade secrets days before resigning his Robert Half employment by searching Robert Half's Client and Candidate Databases for competitively valuable client and candidate information, by exporting that information into Excel documents, by, upon information and belief, transferring these documents into his personal possession, and by emailing his private contact information to over 100 Robert Half clients and candidates.

130.    Should Mr. Cohen continue to disclose or threaten to disclose Robert Half's trade secrets, the disclosure of such information will harm Robert Half and its legitimate business interests.

131.    The acts described above constitute willful and malicious misappropriation in that Mr. Cohen accessed and used an alarming amount of proprietary information and did so with the deliberate intent to injure Robert Half's business and build his and Mission Staffing's own. Accordingly, Robert Half is entitled to an award of reasonable attorneys' fees and exemplary damages under 18 U.S.C. § 1836.

132.    Because Mr. Cohen's misconduct is ongoing and it poses a threat of significant irreparable harm that cannot be compensated by money alone, Robert Half requests that this Court grant injunctive relief against Mr. Cohen from actual or threatened disclosure or utilization of Robert Half's trade secrets, in addition to granting Robert Half its attorneys' fees and exemplary damages.

## COUNT III – TRADE SECRET MISAPPROPRIATION IN VIOLATION OF NEW YORK COMMON LAW

133.    Robert Half incorporates herein by reference the allegations of the preceding paragraphs.

134.    Robert Half owns its confidential information, which encompasses highly sensitive and confidential trade secrets that Robert Half invested years of time and considerable funds to develop and maintain.

135.    Robert Half derives independent economic value from its client and candidate information not being generally known to, or readily ascertainable through proper means by, other persons or entities who can obtain economic value from its disclosure or use.

136.    Robert Half has taken significant measures to maintain the secrecy of its client and candidate information, including restricting access to it.

137.    If information pertaining to Robert Half's clients and candidates is divulged to the public, Mr. Cohen, Mission Staffing, and/or other competitors of Robert Half, it could destroy Robert Half's competitive advantage.

138.    As described herein, Mr. Cohen improperly accessed and converted Robert Half's confidential information for his own use by improperly accessing and, upon information and belief, retaining the confidential information for his own, and Mission Staffing's, benefit.

139.    By virtue of the foregoing conduct, Mr. Cohen misappropriated Robert Half's trade secrets in violation of common law.

140.    As a direct and proximate result thereof, Robert Half has been and will continue to be damaged in an amount to be determined at trial unless Mr. Cohen is enjoined from further misappropriation.

**COUNT IV – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS**

141.    Robert Half incorporates herein by reference the allegations of the preceding paragraphs.

142.    Until the events giving rise to this action, Robert Half has maintained valid business relationships with its customers, including its clients and candidates.

143.    Robert Half's business relationships generated goodwill among these customers and created an expectation of future business.  The knowledge Mr. Cohen has gained about these customers and the business terms of their relationships are confidential and proprietary business information.

144.    Mr. Cohen had influential relationships with Robert Half's clients, which were developed and strengthened over the years by virtue of his access to and knowledge of Robert Half's trade secrets.

145.    As a former Robert Half employee, Mr. Cohen was and remains aware of Robert Half's customer relationships, the unique knowledge Robert Half possesses about these customers, and the business terms of Robert Half's relationships with these customers.

146.    Mr. Cohen has intentionally and improperly interfered with the relationships between Robert Half and its customers by soliciting Robert Half's clients and candidates to cease their business with Robert Half and move their business to Mission Staffing.

147.    Mr. Cohen engaged in wrongful conduct in doing so, by (among other things) breaching his contractual and fiduciary duties to Robert Half.

148.    Mr. Cohen's conduct extends beyond the boundaries of fair competition and has been tortious, in bad faith, dishonest, and designed to harm Robert Half.

149.    Mr. Cohen was aware that this conduct would disrupt Robert Half's business relationships and intended this disruption to occur for the benefit of himself and Mission Staffing.

150.    As a direct and proximate result of Mr. Cohen's conduct, Robert Half has suffered extensive injury, loss of goodwill, harm to its business, and other damages.

151.    As a direct and proximate result of Mr. Cohen's conduct, Robert Half has suffered and will continue to suffer additional damages in an amount that is not presently ascertainable,

including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, in an amount to be proven at trial.

## COUNT V – BREACH OF THE DUTY OF LOYALTY

152.    Robert Half incorporates herein by reference the allegations of the preceding paragraphs.

153.    Mr. Cohen was a Senior Vice President and a Practice Director overseeing the entire CFA function in the Wall Street Office.  He was a trusted, high-level employee with managerial authority.  Robert Half entrusted Mr. Cohen with access to confidential corporate information and placed him in a position of trust, thereby establishing a fiduciary relationship between Robert Half and Mr. Cohen.

154.    As an employee of Robert Half, Mr. Cohen owed Robert Half a duty of loyalty to act in Robert Half's best interests.

155.    As described above in detail, Mr. Cohen materially breached his duty of loyalty to Robert Half in his final days of employment by, among other things: (1) running numerous searches in Robert Half's Candidate and Client Databases; (2) exporting the results of these searches to Excel documents; (3) upon information and belief, transferring these Excel documents into his personal possession; and (4) sending email blasts to more than 100 Robert Half clients and candidates to recruit those clients and candidates for his new employer, Mission Staffing.

156.    As a direct and proximate result of Mr. Cohen's breaches of his duty of loyalty, Robert Half has suffered extensive injury, loss of goodwill, harm to its business, and other damages.

157.    As a direct and proximate result of Mr. Cohen's breaches of his duty of loyalty, Robert Half already has suffered and will continue to suffer additional damages in an amount that

is presently unascertainable, including but not limited to attorneys' fees and costs related to this litigation, as well as lost business, in an amount to be proven at trial.

158.    Mr. Cohen committed these acts knowingly, willfully, and in conscious disregard of Robert Half's rights.  Accordingly, Robert Half is entitled to recover actual and exemplary damages in an amount to be proven at trial.

## COUNT VI – UNFAIR COMPETITION

159.    Robert Half incorporates herein by reference the allegations of the preceding paragraphs.

160.    By virtue of his acts and omissions, Mr. Cohen has unfairly misappropriated and utilized existing and prospective candidate and client relationships of Robert Half and related confidential information, has sought unfairly to capitalize on the goodwill of Robert Half, and has employed unfair and/or deceptive business practices intended to hinder, delay, or prevent Robert Half from fairly competing with Mr. Cohen.

161.    Mr. Cohen has engaged in such acts or omissions maliciously, in bad faith, and for the sole purpose of inflicting harm on Robert Half, or to benefit himself at the expense of Robert Half.

162.    As a result, Robert Half has suffered, and will continue to suffer, injury, damages, and irreparable harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Robert Half Inc. seeks judgment in its favor and an Order against Mr. Cohen that grants the following relief:

a.    During the 12-month period following his separation from Robert Half, such period being tolled during any period of breach (the "Restricted Period"), permanently enjoining Mr.

Cohen from competing with Robert Half in violation of the Employment Agreement on behalf of Mission Staffing or any other entity;

b.      During the Restricted Period, permanently enjoining Mr. Cohen from soliciting or performing services for, or attempting to solicit or perform services for, any client or candidate of Robert Half for which Robert Half's Wall Street Office, located at One Liberty Plaza, New York, NY 10006, performed services at any time within the twelve (12) months preceding the date of Mr. Cohen's resignation;

c.      Permanently enjoining Mr. Cohen from using or disclosing Robert Half's confidential information and trade secrets, as defined by common law and in the Employment Agreement;

d.      Permanently enjoining Mr. Cohen from otherwise violating his Employment Agreement;

e.      Requiring Mr. Cohen to return to Robert Half, without retaining copies thereof, all Robert Half confidential information and trade secrets in his possession, custody, or control;

f.      Permanently enjoining any third party, including Mission Staffing, from using or retaining any Robert Half trade secret or confidential information;

g.      Awarding Robert Half actual, compensatory, and punitive damages; damages based on Mr. Cohen's disgorgement of ill-gotten gains; and such other relief to which it is entitled under applicable law;

h.      Awarding the disgorgement of all amounts earned by Mr. Cohen during periods of disloyalty due to Mr. Cohen's breach of his duty of loyalty to Robert Half; and

i.      Granting such other and further relief as this Court deems just, equitable and proper.

Dated: April 2, 2025                    Respectfully submitted,

                                        **FAEGRE DRINKER BIDDLE & REATH LLP**

                                        By:  _/s/ Joseph C. O'Keefe_
                                             Joseph C. O'Keefe
                                             Clayton D. Harvey
                                             1177 Avenue of the Americas, 41st Floor
                                             New York, NY 10036
                                             Tel: (212) 248-3140
                                             Fax: (212) 248-3141
                                             joseph.okeefe@faegredrinker.com
                                             clayton.harvey@faegredrinker.com

                                             David J. Woolf (*pro hac vice application
                                             forthcoming*)
                                             One Logan Square, Suite 2000
                                             Philadelphia, PA 19103
                                             Tel: (215) 988-2700
                                             Fax: (215) 988-2757
                                             david.woolf@faegredrinker.com

                                             *Attorneys for Plaintiff Robert Half Inc.*

## **VERIFICATION**

I, the undersigned, Richard Deosingh, am employed by Robert Half Inc. as a District President.  Except where otherwise stated, I have personal knowledge of the facts set forth in the attached Verified Complaint and supporting exhibits.  Pursuant to 28 U.S.C. § 1746 and Local Civil Rule of the United States District Court for the Southern District of New York 1.9, I hereby declare and verify under penalty of perjury that I have reviewed the allegations of fact set forth in the Verified Complaint, and that said facts are true, correct, and accurate to the best of my knowledge, information and belief.

Executed on this 2nd day of April 2025.

_____
Richard Deosingh